## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

LORI L. DEATRICH-RIDENOUR,    )
    )
    Plaintiff,    )
    )
    v.    )    **CAUSE NO. 1:05-CV-00241**
    )
JO ANNE B. BARNHART,    )
**Commissioner of Social Security,**    )
    )
    Defendant.    )

## OPINION AND ORDER

Plaintiff Lori L. Deatrich-Ridenour appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying Ridenour's application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB").[1] (*See* Docket # 4.) For the reasons set forth herein, the Commissioner's decision will be REVERSED and the case will be REMANDED to the Commissioner for additional proceedings in accordance with this opinion.

### I.  PROCEDURAL HISTORY

Ridenour applied for DIB on April 26, 2002, alleging that she became disabled as of December 27, 1997.[2] (Tr. 108-10.) The Commissioner denied her application initially and upon

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

[2] Ridenour previously filed an application for DIB on July 5, 2000, alleging similar impairments and the same DIB onset date. (Tr. 112-14.) However, her application was denied on reconsideration on February 8, 2001. (Tr. 87-94.) Ridenour did not appeal this determination; therefore, it became final and binding. *See* 20 C.F.R. § 404.921. Accordingly, the Commissioner argues, and Ridenour does not dispute, that the relevant period in this case is February 9, 2001, to September 30, 2003, the date her DIB insured status expired. (Tr. 106); *see* SSR 69-38(c);

reconsideration, and Ridenour requested an administrative hearing. (Tr. 76-77, 83-86.)

On December 2, 2004, Administrative Law Judge (ALJ) Frederick McGrath conducted a hearing at which Ridenour, who was represented by counsel, Ridenour's husband, a friend of Ridenour's, and a vocational expert testified. (Tr. 26-64.)  On March 4, 2005, the ALJ rendered an unfavorable decision to Ridenour, concluding that she was not disabled because she could perform a significant number of jobs in the national economy despite the limitations caused by her impairments. (Tr. 12-21.)  The Appeals Council denied Ridenour's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 5-8.)

Accordingly, Ridenour filed a complaint with this Court on July 20, 2005, seeking relief from the Commissioner's final decision. (Docket # 2.)  This appeal became ripe for the Court's review as of February 10, 2006. (*See* Docket # 13-17.)

## II.  THE PARTIES' POSITIONS

Ridenour asserts that the Commissioner erred in his final decision by failing to properly evaluate the opinions of Dr. Reginald Stiles, her treating family practitioner; Dr. Eric Jenkinson, her treating orthopaedic surgeon; and Dr. H.M. Bacchus, an examining state agency physician. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 at 15-20.)  The Commissioner, however, argues that substantial evidence supports the decision to deny Ridenour a period of disability.  More specifically, the Commissioner contends that the ALJ was not required to  consider the opinions of Dr. Stiles and Dr. Jenkinson, because they were rendered

---

SSR 74-8(c).  Nonetheless, as the ALJ does not expressly address the principle of *res judicata*, and because it is not rigidly applied in social security cases, the ALJ should address this upon remand to confirm the relevant period of review. *See generally Campbell v. Shalala*, 988 F.2d 741, 745 (7th Cir. 1993); *Krizan v. Apfel*, 35 F. Supp. 2d 672, 676-77 (N.D. Ind. 1999); *Antonucci v. Chater*, No. 93-CV-0738E(F), 1996 WL 304528 (W.D.N.Y. May 30, 1996); 14 American Law Reports Federal 776 (originally published in 1973).

approximately fourteen months after the date Ridenour was last insured for DIB, and asserts that the ALJ properly discounted Dr. Bacchus's opinion because it is not well-supported by medical evidence. (Mem. in Supp. of the Commissioner's Decision at 7-8.)

## III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the case for a rehearing." 42 U.S.C. § 405(g).  The ALJ's decision must be sustained if it is supported by substantial evidence. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Id.*

Under this standard, the Court reviews the entire administrative record, but does not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.*  Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Id.*

## IV.  THE LAW

To be considered disabled under the Social Security Act, a claimant must establish that she is "[unable] to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1); 42 U.S.C. § 423(d)(1)(A).  The impairment must be severe, causing the claimant to be unable to do her previous work, or any

other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 405.1505-1511.

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[3] 20 C.F.R. § 404.1520; *see also Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant on every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

## V. APPLICATION AND ANALYSIS

### A. **The Facts**[4]

#### 1. Background

At the time of the hearing, Ridenour was forty-six years old, had a high school education,

---

[3] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC"), or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

[4] The administrative record in this case is voluminous (339 pages), and the parties' disputes involve only small portions of it. Therefore, in the interest of brevity, this opinion recounts only the portions of the record necessary to the decision.

and possessed work experience as a baker, cashier, and stock clerk. (Tr. 108, 159, 184-85.)

Ridenour most recently worked as a cashier and stocker, but left that job on December 26, 1997,

because it "was hard on [her] back, standing in one place continually, and [her] hands developed

muscle cramps." (Tr. 32.)  Ridenour alleges she became disabled as of December 27, 1997, due

to low back pain, numbness on her right side, arthritis of her neck, overuse syndrome of her right

arm, blood in her urine, and depression. (Tr. 116.)  Currently she spends her time preparing

meals, performing housework, and caring for her family, including on a "good day" such tasks as

cleaning out a refrigerator, washing mold from walls of a closet, and collecting boxes of clothing

for the Christmas bureau. (Tr. 40-48.)  However, she states that she incorporates frequent rest

periods (at least two naps, each one to two hours in length) throughout her day due to her pain

and fatigue and that her family assists her with housework when she is unable to complete it

independently. (Tr. 40, 43-47, 52.)

Ridenour testified that at the time of the hearing she could stand for one-half hour before

needing to sit down or walk, could walk for 200 feet before having to stop, and could sit for an

hour before needing to change positions. (Tr. 32-33.)  She further stated that during a workday

on an occasional basis she could (1) lift and carry objects weighing up to ten pounds; (2) use her

whole hand to seize, hold, grasp, or turn an object; and (3) use her fingers to manipulate, pick up,

or pinch items. (Tr. 33-34.)

Ridenour described her neck pain as "hot and swollen," like "arthritis," and stated that it

is aggravated by lifting or bending, rating it on a ten-point scale at its worst as a five or six and at

its best as a two. (Tr. 35.)  She described her low back pain as "hot and inflamed," "tingly

numbness," and a "sharp shooting pain," and stated that it is aggravated by lifting and bending,

5

rating it at its worst as a ten and at its best as a four. (Tr. 36-37.)  Ridenour explained that her

right leg pain, which she describes as feeling like "needles and pins," goes from her belt line

down to her foot, rating it at its worst as a ten and at its best as a three. (Tr. 37-38.)  She

described her hands and arm pain as "real tight skin," "cramping," and "stiffness," rating it at its

worst as an eight and at its best as a two. (Tr. 38.)  Ridenour further reported that she takes

prescription medication to help relieve her pain, but it makes her "very tired, fatigued, and

terrible thirsty." (Tr. 39.)

In addition to her physical complaints, Ridenour reports that she at times "get[s] a little

confused," feeling like her mind gets "all jumbled up." (Tr. 45.)  She also reports that

approximately seven days out of every month she will have crying spells and will want to stay in

her room in darkness, unable to accomplish even basic household tasks. (Tr. 48.)

### 2. Relevant Medical Evidence

<u>1997</u>

On December 29, 1997, Ridenour visited Dr. Thomas Van Den Driessche, her family

practitioner, complaining of low back pain of three weeks duration, numbness on the right side

of her face, and urinary incontinence. (Tr. 229.)  She stated that her lumbosacral pain had been

present for about fifteen years, but it had recently intensified to a level that she could not stand.

(Tr. 229.)  She also reported episodic numbness and loss of sensation in her right buttock,

episodic right leg parasthesias, and episodic right face and right arm numbness, which had been

ongoing for several years; she denied, however, any drooping of her facial features or weakness

of her right extremities. (Tr. 229.)

On physical examination, Ridenour was negative in a straight leg raising test and had no

6

apparent changes in her facial features; her upper extremities had equal hand grips and no loss of sensation or paresthesias. (Tr. 229.)  Dr. Van Den Driessche assigned a diagnosis of lumbar sacral strain and recommended that Ridenour return in two weeks. (Tr. 229.)  Two weeks later, Ridenour reported to Dr. Van Den Driessche that she was not much better, as she was still unable to lift more than ten pounds. (Tr. 228.)  He then ordered an MRI and physical therapy, excused Ridenour from work for two weeks, and referred her to a neurologist. (Tr. 228.)

<u>1998</u>

On February 10, 1998, Ridenour visited Dr. Bhunpendra Shah, a neurologist, complaining of numbness of her hand, right foot, and right side of her face of four years duration. (Tr. 199-200.)  On neurological examination, Ridenour had a decreased response to pinprick in her right arm as compared to her left; otherwise, the exam was normal. (Tr. 199.)  An MRI of her brain raised the possibility of multiple sclerosis (Tr. 196); however, findings from a spinal tap came back unremarkable (Tr. 188-89).  Therefore, Dr. Shah opined that there was no clear cut evidence of multiple sclerosis, though it could not be ruled out. (Tr. 188-89.)

<u>1999</u>

On June 9, 1999, Ridenour visited Dr. Van Den Driessche, complaining of fatigue and wanting to talk about her Prozac. (Tr. 226-27.)  On September 28, 1999, she reported to Dr. Van Den Driessche that she was experiencing frequent crying episodes and was having difficulty sleeping; he diagnosed her with anxiety and changed her Prozac dosage. (Tr. 226-27.)

<u>2000</u>

On May 30, 2000, Ridenour went to the emergency room at Wyoming Medical Center after having been struck on the right side of her head by someone with a closed fist. (Tr. 203-04.)

She complained of non-severe pain in the right side of her head, but denied any visual disturbances, nausea, vomiting, dizziness, paralysis, or paresthesia. (Tr. 203-04.)  Her physical exam was normal. (Tr. 203-04.)  An x-ray of her cervical spine did not show any acute abnormalities, but there were some degenerative changes. (Tr. 203-04.)  She was diagnosed with a closed head injury without loss of consciousness and a neck strain secondary to assault. (Tr. 203-04.)

On August 22, 2000, Ridenour was evaluated by Dr. Venkata Kancherla at the request of the state agency. (Tr. 206-08.)  At the visit, Ridenour complained of low back pain, neck pain, cramps in her hands and arms, and shooting pains on her right side. (Tr. 206.)  On physical exam, Ridenour was unable to squat due to back pain and had mild tenderness over the lumbosacral spine with straight leg raising at seventy degrees bilaterally; her lumbar back dorsiflexion was seventy degrees, extension twenty degrees, and lateral rotation twenty degrees. (Tr. 207.)  A neurological examination was normal. (Tr. 207.)  Dr. Kancherla assigned a diagnosis of mild tenderness over the lumbosacral spine; generalized myalgia over the neck, right arm, and right hand without any neuropathy; history of depression, stable on medication; and history of overuse syndromes. (Tr. 208.)

On August 19, 2000, Ridenour was given a mental status examination by Wayne J. Von Bargen, Ph.D., at the request of the state agency. (Tr. 211-12.)  In describing her difficulties to Dr. Von Bargen, Ridenour stated that she had a bad back, overuse syndrome in her right hand, and depression that was like a "cloud over [her] head." (Tr. 211.)  She described her prescribed Prozac as a "miracle" and that her mood was "not too bad" if she stays on it, admitting that she has never received counseling or psychotherapy. (Tr. 211.)  Dr. Von Bargen indicated that her

history suggested a presence of a dysthymic disorder, which had improved with treatment, and a possible pain disorder.[5] (Tr. 212.)   He concluded that she appeared to be able to adequately care for herself and perform routine daily activities, assigning her a Global Assessment of Functioning (GAF) score of 65.[6] (Tr. 212.)

On September 12, 2000, F. Kladder, Ph.D., reviewed Ridenour's medical record at the request of the state agency, concluding that Ridenour had only a slight degree of functional limitation due to her mental impairments. (Tr. 214-23.)

2001

On January 24, 2001, Dr. Van Den Driessche reported to Social Security that Ridenour's main problem was her low back pain secondary to sciatica, but that if she takes her prescription medication on a regular basis and limits her activity, it is not a major problem. (Tr. 225.)  He also reported that she struggles with depression and anxiety for which she was receiving medication, which seemed to improve, but not resolve, her sleep difficulties and symptoms of emotional lability. (Tr. 225.)

On February 8, 2001, Dr. T.R. Crawford reviewed Ridenour's medical record at the request of the state agency, opining that Ridenour could lift and carry up to twenty pounds occasionally, could lift and carry up to ten pounds frequently, could stand or walk about six

---

[5] A dysthymic disorder is characterized by symptoms of depression. *The Merck Manual* 1538 (Mark H. Beers & Robert Berkow, eds., 17th ed. 1999).

[6] GAF is a clinician's judgment of an individual's overall level of psychological, social, and occupational functioning on a hypothetical continuum of mental health illness; the GAF excludes any physical or environmental limitations. *See* American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. 2000).  A GAF score of sixty-five means an individual experiences some mild symptoms or some difficulty in social, occupational, or school functioning, but generally is functioning pretty well and has some meaningful personal relationships. *Id*.

hours in an eight-hour workday, could sit about six hours in an eight-hour workday, and had a limited ability to perform handling tasks. (Tr. 252-59.)

2002

On August 1, 2002, Dr. H.M. Bacchus, Jr., evaluated Ridenour at the request of the state agency. (Tr. 260-62.)  On physical exam, Ridenour was able to get on and off the exam table with no signs of dyspnea or fatigue; her gait, station, muscle strength, tone, and grip strength were all normal. (Tr. 260-62.)  Dr. Bacchus diagnosed Ridenour with overuse syndrome of the right upper extremity; mild bilateral carpal tunnel syndrome; arthritis of the neck, low back, and right hip with fairly normal range of motion; and depression. (Tr. 260-62.)  He opined that Ridenour retained enough physical functional capacity to perform at least part-time duties with three hours sitting and one hour standing, noncontinuous. (Tr. 261.)

On August 26, 2002, Sherwin Kepes, Ph.D., evaluated Ridenour at the request of the state agency. (Tr. 264-67.)  Ridenour reported to Dr. Kepes that she spent her time around the house doing as much as she could with respect to the typical array of household chores. (Tr. 264.)  She reported no problems with alcohol or drugs, but did communicate that she had difficulty sleeping through the night because of physical discomfort. (Tr. 264.)  Upon examination, Dr. Kepes observed that Ridenour's overall dress and grooming were marginally adequate, but noted that she appeared to be in some emotional distress, as she became tearful on more than one occasion during the appointment. (Tr. 265.)  Dr. Kepes did not note any significant problems with cognition or mentation. (Tr. 265-66.)  He assigned a diagnosis of major depressive disorder (recurrent, moderate) with a GAF of sixty and strongly encouraged her

10

to seek counseling and medication.[7] (Tr. 267.)

On September 10, 2002, Dr. A. Lopez reviewed Ridenour's medical evidence at the request of the state agency, concluding that she did not have a severe impairment. (Tr. 270-84.) Likewise, on that same date, D. Universaw, Ph.D., reviewed Ridenour's medical evidence and determined that she had only mild functional limitations due to her mental impairment.[8] (Tr. 280.)

Also on September 10, 2002, Ridenour visited Dr. Stiles, her new family practitioner, to obtain some refills for her medicines. (Tr. 309.)  He assessed that she was depressed and scheduled her for a follow-up visit three days later. (Tr. 309.)

2003

On February 11, 2003, Ridenour returned to Dr. Stiles. (Tr. 309.)  He referred her for some x-rays and prescribed a new medication. (Tr. 309.)

On February 14, 2003, Ridenour underwent several MRIs at St. Joseph Hospital. (Tr. 285-89.)  The MRI of her thoracic spine showed mild disc bulging at T5-6 and T9-10 without acquired central stenosis, the MRI of her hips was normal, and the MRI of her lumbar spine showed mild spondylosis and a small foraminal disk protrusion at the L4-5 level, which had led to moderate foraminal narrowing. (Tr. 285-89.)

On June 25, 2003, Ridenour visited Dr. Eric J. Jenkinson, an orthopaedic surgeon at Orthopaedics Northeast, for a five to ten year history of low back pain and numbness and

---

[7] A GAF score of sixty means an individual experiences moderate symptoms or has moderate difficulty in social, occupational, or school functioning. *See* American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. 2000).

[8] On March 4, 2003, W. Shipley, Ph.D., affirmed Dr. Universaw's opinion. (Tr. 270.)

tingling on the right side of her face and in her right arm. (Tr. 300-01.)  On physical exam, Dr. Jenkinson found that Ridenour had "pretty good" forward flexion and extension of her back, but that she had pain over the trochanteric area and some tightness of the IT band. (Tr. 300-01.)  She demonstrated full internal rotation of the hips without any significant pain, her straight leg raising test was negative, and she had good strength. (Tr. 300-01.)  Dr. Jenkinson reviewed Ridenour's MRI and diagnosed her with trochanteric bursitis and right radiculitis. (Tr. 300-01.)  He performed a trochanteric injection, which she tolerated well, set up an epidural for her, and gave her a prescription for a carotid ultrasound and physical therapy. (Tr. 300-01.)

On September 8, 2003, Ridenour returned to Dr. Stiles, complaining of pain and swelling in her right middle finger. (Tr. 308.)  She was seen by him two additional times later that month for follow-up care. (Tr. 308.)

<u>2004</u>

On April 23, 2004, Ridenour returned to Dr. Jenkinson for re-evaluation. (Tr. 298.)  She reported that the right trochanteric injection had provided her with 100% relief of her symptoms for two or three months, but that her right lower extremity pain returned in January. (Tr. 298.)  She explained that her symptoms were worse at night, rating her pain as a nine on a ten-point scale, but denied having any left lower extremity pain. (Tr. 298.)  She described her pain as a "burning, numbness, and tingling sensation" beginning in her right lateral hip and extending down her right leg. (Tr. 298.)  On physical exam, she ambulated with an antalgic gait favoring her right leg and had tenderness to palpitation over the lumbosacral spine and right greater trochanter. (Tr. 298.)  A straight leg raise test on the right reproduced lateral hip pain, but was negative on the left side; internal hip range of motion on the right did not produce any pain, but

12

external range of motion on the right reproduced lateral hip discomfort. (Tr. 298.)  Her muscle

strength was normal. (Tr. 298.)  Dr. Jenkinson scheduled Ridenour for another upper lumbar

epidural injection. (Tr. 298.)

On May 5, 2004, Ridenour visited Dr. Robert E. Gould at Orthopaedics Northeast. (Tr.

295-97.)  On physical examination, Ridenour was tender to palpitation over the lumbar spine and

the right greater trochanter. (Tr. 295.)  Bilaterally, her straight leg raise test was negative, and

her strength was normal. (Tr. 295.)  He assigned Ridenour a diagnosis of right lower extremity

radiculopathy and performed a right L5-S1 transforaminal epidural steroid injection with

fluoroscopic guidance. (Tr. 296-97.)

On June 1, 2004, Ridenour returned to Dr. Jenkinson for a follow-up appointment after

receiving an epidural. (Tr. 292.)  She reported "pretty good relief" from that treatment, but noted

that her pain was still present somewhat deep within the buttock area. (Tr. 292.)  She also

reported that physical therapy was "somewhat" helpful, but that she was still getting some

clicking around her hip. (Tr. 292.)  On physical exam, a straight leg raising test was negative

bilaterally, and she had good internal and external rotation of her hips, with some pain upon

internal rotation. (Tr. 292.)  She reported no pain over the trochanteric area. (Tr. 292.)  Dr.

Jenkinson assigned a diagnosis of deep pyriformis-type pain and recommended that she continue

to take Aleve and a few more sessions of physical therapy. (Tr. 292.)  He also noted that

pyriformis injections and x-rays of Ridenour's hip may be necessary in a subsequent

appointment. (Tr. 292.)

On November 9, 2004, Dr. Stiles completed a Medical Source Statement on Ridenour's

behalf. (Tr. 327-29.)  He assigned her a diagnosis of acute depression (severe), hepatitis C

(chronic), and low back strain (chronic), opining that Ridenour's prognosis for all three conditions was poor. (Tr. 327.)  He listed her symptoms as crying spells, dizziness, fatigue, and intermittent pain in the low back of thirty to sixty minutes duration. (Tr. 327.)  He identified x-rays of the lumbar, sacral, and thoracic spine as the clinical findings and objective signs supporting his opinion. (Tr. 328.)  He further opined that Ridenour could work only fifteen to twenty hours a week, that her pain and other symptoms would be severe enough to interfere with her attention or concentration needed to perform even simple repetitive tasks on a frequent basis, and that she would likely miss work more than three days a month due to her medical condition. (Tr. 328.)  He further opined that her severe depression and crying spells contributed to the severity of her symptoms and functional limitations. (Tr. 328.)

On November 29, 2004, Dr. Jenkinson completed a Medical Source Statement. (Tr. 325-26.)  He reported a diagnosis of L4-5 protrusion, right sided, with some foraminal narrowing and facet arthritis, and symptoms of pain (described as "throbbing, burning, and sharp at times") and tingling in the right lateral aspect of her hip extending down her leg and across her back, tingling on the right side of her face and in her right arm, and clicking on and off into the lateral aspect of her hip, ranging in intensity from five to ten on a ten-point scale. (Tr. 325-26.)  He indicated that Ridenour's pain was triggered by activity and that it increased in intensity with continuous activity. (Tr. 326.)  He opined that Ridenour had a fair prognosis, but that her pain would likely never resolve with treatment and thus his intervention was focused on calming down her symptoms. (Tr. 325-26.)

As to clinical and objective findings, Dr. Jenkinson noted that Ridenour had good internal and external rotation of the hips, adequate strength in her lower extremities, no

14

significant pain with straight leg raising, and intact and equal reflexes on both sides. (Tr. 326.) He also noted that the severity of Ridenour's pain was likely heightened as a result of her emotional disturbances. (Tr. 326.)  Dr. Jenkinson opined that Ridenour could work between twenty-five and thirty hours a week, that she would experience pain and other symptoms that would be severe enough to interfere with her attention or concentration needed to perform even simple tasks on a frequent basis, and that she would likely miss work more than three days a month due to her medical condition. (Tr. 326.)

### 3. The ALJ's Decision

On March 4, 2005, the ALJ rendered his opinion. (Tr. 12-21.)  He found at step one of the five-step analysis that Ridenour had not engaged in substantial gainful activity, and at step two that she had severe impairments. (Tr. 17.)  However, at step three, he determined that Ridenour's impairments were not severe enough to meet a listing. (Tr. 17.)  Before proceeding to step four, the ALJ determined that Ridenour had the RFC to perform "light work as defined in 20 CFR § 404.1567 that involves no work in handling or preparing food and no work in the healthcare industry." (Tr. 17.)  Based on this RFC, the ALJ concluded at step four that Ridenour could perform her past relevant work as a cashier and thus was not disabled. (Tr. 18.) Nonetheless, the ALJ proceeded to step five where he determined that Ridenour could also perform a significant range of light work available in the national economy, including that of a counter clerk, furniture rental consultant, and dealer account investigator, as well as a variety of sedentary positions, including that of a call out operator, security surveillance monitor, and charge account clerk. (Tr. 19.)  Therefore, Ridenour's claim for DIB was denied. (Tr. 20.)

15

### B.  The Analysis

#### 1.  The ALJ Erred by Failing to Evaluate the Opinion of
#### Dr. Stiles, Ridenour's Treating Family Practitioner

In denying Ridenour DIB, the ALJ failed to consider the opinion of Dr. Stiles,

Ridenour's treating family practitioner.  As Ridenour correctly asserts, this omission by the ALJ

is an error that necessitates a remand.

The Seventh Circuit has stated that "more weight is generally given to the opinion of a

treating physician because of his greater familiarity with the claimant's conditions and

circumstances." *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. § 404.1527(d)(2).  However, this

principle is not absolute, as "a treating physician's opinion regarding the nature and severity of a

medical condition is [only] entitled to controlling weight if it is well supported by medical

findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at

870; *see also* 20 C.F.R. § 404.1527(d)(2); *Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir.

2002).

In the event the treating physician's opinion is not well supported or is inconsistent with

other substantial evidence, the Commissioner must apply the following factors to determine the

proper weight to give the opinion: (1) the length of the treatment relationship and frequency of

examination; (2) the nature and extent of the treatment relationship; (3) how much supporting

evidence is provided; (4) the consistency between the opinion and the record as a whole; (5)

whether the treating physician is a specialist; and (6) any other factors brought to the attention of

the Commissioner. 20 C.F.R. § 404.1527(d); *see also Books v. Chater*, 91 F.3d 972, 979 (7th Cir.

1996).

Furthermore, contrary to many eager claimants' arguments, a claimant is not entitled to

16

DIB simply because her treating physician states that she is "unable to work" or "disabled," *Clifford*, 227 F.3d at 870; the determination of disability is reserved to the Commissioner, *id.*; *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995); *see also* 20 C.F.R. § 404.1527(e)(1). Regardless of the outcome, the Commissioner must always give good reasons for the weight ultimately applied to the treating source's opinion. *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. § 404.1527(d)(2).

Here, the ALJ failed to mention, much less discuss, Dr. Stiles's opinion penned on November 11, 2004, which concluded that Ridenour has the capacity to work only fifteen to twenty hours per week, has severe back pain that lasts thirty to sixty minutes and worsens with activity, has crying spells that would limit her ability to perform in a work environment, experiences pain and fatigue that would frequently interfere with her attention and concentration to perform simple work tasks, and would likely miss more than three days of work a month due to her impairment or treatment.  Clearly, the ALJ's failure to address Dr. Stiles's opinion constitutes an error necessitating a remand. *See* 20 C.F.R. § 404.1527(d) ("[W]e will evaluate every medical opinion we receive."); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 354 (7th Cir. 2005) ("In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review."); *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 785 (7th Cir. 2003) (opining that when probative evidence is left unmentioned by the ALJ, the court is left to wonder whether it was even considered); *Golembiwski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) (emphasizing that an ALJ must not ignore evidence which contradicts his opinion, but must evaluate the record fairly); *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000) (stating that the ALJ's failure to

17

discuss a physician's report "in its entirety prevents [the] court from tracking the ALJ's reasons for discounting it"); *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994) (stating that "the ALJ's decision must be based upon consideration of all the relevant evidence and that the ALJ must articulate at some minimal level his analysis of the evidence") (internal quotation marks omitted).

The Commissioner, however, argues that the ALJ did not error when he failed to discuss Dr. Stiles's opinion, because the opinion postdated Ridenour's last insured date by approximately fourteen months, and thus the ALJ did not need to consider it.  "The first problem with [the Commissioner's] argument is that the ALJ did not make it. 'Principles of administrative law require the ALJ to rationally articulate the grounds for [his] decision and confine [judicial] review to the reasons supplied by the ALJ.'" *Blom v. Barnhart*, 363 F. Supp. 2d 1041, 1059 (E.D. Wis. 2005) (quoting *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002)); *see also Zblewski v. Schweiker*, 732 F.2d 75, 79 (7th Cir.1984) (emphasizing that unless the ALJ sufficiently articulates his reasoning, the reviewing court cannot tell if the ALJ rejected probative evidence or simply ignored it).

Furthermore, "[t]here can be no doubt that medical evidence from a time subsequent to a certain period is relevant to a determination of a claimant's condition during that period." *Blom*, 363 F. Supp. 2d at 1059 (quoting *Halvorsen v. Heckler*, 743 F.2d 1221, 1225 (7th Cir. 1984)); *see also Anderson v. Sullivan*, 925 F.2d 220, 222 (7th Cir. 1991) (acknowledging the relevancy of medical opinions that postdate the date last insured); *Ray v. Bowen*, 843 F.2d 998, 1005-06 (7th Cir. 1988).  Here, Dr. Stiles treated Ridenour during the relevant period and rendered his opinion merely fourteen months after the date last insured; thus the ALJ erred by failing to

consider his opinion.[9]  Moreover, if the ALJ was uncertain as to the applicability of Dr. Stiles's

opinion to the relevant time period, he could have contacted him to request additional

clarification. 20 C.F.R. § 404.1512(e); SSR 96-5p; *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th

Cir. 2004) (stating that an ALJ must recontact medical sources "when the evidence received is

inadequate to determine whether the claimant is disabled").  Clearly, the Commissioner's *post

hoc* argument attempting to rehabilitate the ALJ's omission falls short.

### 2.  The ALJ Erred When Evaluating the Opinion of Dr. Jenkinson, Ridenour's Treating Orthopaedic Surgeon

Ridenour contends that the ALJ further erred by improperly evaluating the opinion of Dr.

Jenkinson, her treating orthopaedic surgeon, which was penned on November 29, 2004.  Here, in

contrast to the total void surrounding Dr. Stiles's opinion, the ALJ did discuss Dr. Jenkinson's

opinion; nevertheless, he erred by failing to evaluate it in accordance with the law (articulated

*supra*) applicable to evaluating treating physician's opinions.

First, the ALJ erred by failing to state why he declined to assign Dr. Jenkinson's opinion

controlling weight.[10] *See Skarbek,* 390 F.3d at 503-04 (7th Cir. 2004) (stating that an ALJ may

---

[9] In *Meredith v. Bowen*, 833 F.2d 650, 655 (7th Cir. 1987), the court held that medical opinions of disability rendered eleven years after the date a claimant was last insured were not relevant, attributing some significance to the fact that the claimant's symptoms on which the opinions of disability were based varied from the symptoms the claimant alleged eleven years earlier.  In contrast, here Dr. Stiles treated Ridenour during the relevant period and rendered his opinion only fourteen months after the last date insured, citing the same symptoms Ridenour consistently complained of during the relevant period.  Therefore, the facts in this case are clearly distinguishable from the facts in *Meredith*.

[10] While the ALJ fails to articulate his reason for rejecting Dr. Jenkinson's opinion, he appears to attribute his general denial of DIB solely to Ridenour's ability to "attend to her own personal needs," opining an entire paragraph on Ridenour's ability to dress and bathe herself, perform housework, drive, visit relatives, and care for children. (Tr. 17.) However, the Seventh Circuit has cautioned the Commissioner against "placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside of the home." *Mendez v. Barnhart*, No. 05-2017, 2006 WL 463258, at *3 (7th Cir. Feb. 28, 2006).  As emphasized in *Shramek v. Apfel*, 226 F.3d 809, 813 (7th Cir. 2000), the work of caring for children and a house "by its nature provides the type of flexibility to alternate standing, sitting and walking, and to rest and elevate the legs when necessary." *See also Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005) (emphasizing that an ALJ must not casually equate household

discount a treating physician's opinion if it is not well-supported by medical findings or is inconsistent with substantial evidence of record, as long as he minimally articulates his reasons for crediting or rejecting evidence of disability); *Herron*, 19 F.3d at 333; *see generally Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996) (stating that an ALJ must sufficiently articulate the ALJ's assessment of the evidence to assure that the important evidence has been considered and that the ALJ's path of reasoning can be traced); *McGraw v. Apfel*, 87 F. Supp. 2d 845, 856 (N.D. Ind. 1999).  Then, after the ALJ concluded that the opinion did not merit controlling weight, he further erred by failing to properly evaluate it for purposes of assigning it an appropriate weight.

When a treating physician's opinion is found to be inconsistent with other evidence in the record and thus not entitled to controlling weight, it is still entitled to deference and must be weighed using all the factors in 20 C.F.R. § 404.1527. *See* 20 C.F.R. § 404.1527.  Here the ALJ simply dismissed Dr. Jenkinson's opinion, never discussing (1) that Dr. Jenkinson was one of Ridenour's treating physicians; (2) that Dr. Jenkinson was a specialist in orthopaedics; (3) the length of Ridenour's treatment relationship with Dr. Jenkinson and the frequency of examination; or (4) the nature and extent of the treatment relationship.[11] *See generally Books*, 91 F.3d at 979 (articulating that when conflicting medical evidence exists, the ALJ must consider the factors articulated in 20 C.F.R. § 404.1527); *Rohan*, 98 F.3d at 971.

---

work with employment in the national economy, as the choice of caring for children or abandoning them to another's care may impel a claimant to heroic efforts).  Therefore, while the ALJ's opinion fails to minimally articulate his path of reasoning with respect to  Dr. Jenkinson's opinion and therefore must be remanded, the evidence on which the ALJ *apparently* based his decision also lacks credence.

[11] As with Dr. Stiles's opinion, the Commissioner argues on a *post hoc* basis that the ALJ did not have to consider Dr. Jenkinson's opinion because it was rendered fourteen months after Ridenour's last insured date. However, for the same reasons articulated *supra* in the context of Dr. Stiles's opinion, the Commissioner's argument is unsuccessful.

Thus, by dismissing Dr. Jenkinson's opinion without discussing why it did not merit controlling weight and without assigning it a weight through analysis of the required factors, the ALJ erred.

### 3.  The ALJ Erred When Considering the Opinion of Dr. Bacchus, an Examining State Agency Physician

Finally, Ridenour asserts that the ALJ erred by failing to properly consider the opinion of Dr. Bacchus, a state agency physician who examined Ridenour on August 1, 2002.  Again, the ALJ's failure to minimally articulate his reasoning in rejecting Dr. Bacchus's opinion necessitates a remand.

The Commissioner must "evaluate every medical opinion [it] receive[s]." 20 C.F.R. 404.1527(d).  Each medical opinion, other than a treating physician's opinion entitled to controlling weight, must be evaluated pursuant to factors (articulated *supra*) set forth in 20 C.F.R. § 404.1527(d) to determine the proper weight to apply to it. *See* 20 C.F.R. § 404.1527(d); SSR 96-2p; *see generally White v. Barnhart*, 415 F.3d 654, 658-60 (7th Cir. 2005); *Windus v. Barnhart*, 345 F. Supp. 2d 928, 939-43 (E.D. Wis. 2004).

Here, the ALJ described Dr. Bacchus's opinion in detail, which concluded that Ridenour had enough functional capacity to perform at least part-time duties with three hours sitting and one hour standing, noncontinuous.  However, as with Dr. Jenkinson's opinion, the ALJ failed to articulate why he ultimately rejected Dr. Bacchus's opinion, never discussing any of the required factors.  The Commissioner's *post hoc* argument that Dr. Bacchus's opinion was not well-supported by medical findings and was internally inconsistent is unavailing, as the Court is confined to the reasons, or lack thereof, articulated by the ALJ in his opinion. *See Zblewski*, 732 F.2d at 79; *Blom*, 363 F. Supp. 2d at 1059; *Wates v. Barnhart*, 288 F. Supp. 2d 947, 950 (E.D.

21

Wis. 2003) (emphasizing that in reviewing an ALJ's decision, the court is confined to the reasons the ALJ provided and cannot supply its own reasons or rely on the Commissioner's *post hoc* rationalizations).  Thus, the ALJ again fatally erred by failing to minimally articulate his path of reasoning.[12]

## VI.  CONCLUSION

As discussed herein, the ALJ's consideration of the opinions of Dr. Stiles, Ridenour's treating family practitioner; Dr. Jenkinson, Ridenour's treating orthopaedic surgeon; and Dr. Bacchus, an examining state agency physician, contained legal error.  Therefore, the decision of the Commissioner is REVERSED and the case is REMANDED to the Commissioner for further proceedings in accordance with this opinion.  The Clerk is directed to enter a judgment in favor of Ridenour and against the Commissioner.  SO ORDERED.

Enter for this 13th day of March, 2006.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge

---

[12] *See supra* note 10.